1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

JULIA WU, an individual,           )    Case No. EDCV 07-1584 VAP (OPx)
11                                 )
                    Plaintiff,     )    FINDINGS OF FACT AND CONCLUSIONS
12                                 )    OF LAW AFTER COURT TRIAL [Fed. R.
         v.                        )    Civ. P. 52]
13                                 )
MARY ANN DOUCETTE, aka "Mimi       )
14   Doucette," an individual, and )
     DOUCETTE MEDICAL SUPPLY,       )
15   LTD., a Wisconsin corporation, )
                                   )
16                  Defendants      )
     _____ )
17                                 )
     DOUCETTE MEDICAL SUPPLY,       )
18   LTD., a Wisconsin corporation, )
                                   )
19                  Counterclaimant )
                                   )
20       v.                        )
                                   )
21   JULIA WU, an individual,       )
                                   )
22                  Counterclaim-   )
                     Defendant      )
23   _____ )

24

25

26          This case was tried to the Court on February 16 through 19, 2010;

Plaintiff/Counterclaim-Defendant thereafter timely filed a post-trial brief in the form of

27   Revised Proposed Findings of Fact and Conclusions of Law on February 23, 2010, as

28   permitted by the Court, and the Court deemed the matter submitted.  Having considered all

1  the evidence presented by the parties, as well as the argument and briefing by counsel,

2  the Court makes the following Findings of Fact and Conclusions of Law pursuant to

3  Federal Rule of Civil Procedure 52.

4

5                              **FINDINGS OF FACT**

6  1.  Plaintiff and Counterclaim-defendant Julia Wu ("Wu") is a resident of Shanghai,

7      China.  [Final Pretrial Conference Order ("PTCO ") ¶ 2.]

8  2.  Defendant and Counterclaimant Mary Ann Doucette ("Doucette") is a resident of

9      Riverside County, California, in the Central District of California, Eastern Division.

10     (PTCO ¶ 2.)  Defendant Doucette Medical Supply, Ltd. ("Doucette Medical") is a

11     Wisconsin corporation qualified to do business in California and which at all times

12     relevant to this action has had its principal place of business in California.  (PTCO ¶

13     2.)  Doucette is and always has been the sole shareholder and owner of Doucette

14     Medical.  (Defendants' Memorandum of Contentions of Fact and Law ("Defs.'

15     Mem.") at 2.)  Every act and omission of Doucette described in this Memorandum

16     Opinion is also an act or omission on the part of Doucette Medical.

17

18                           **CLAIMS IN THE COMPLAINT**

19     **Breach of Contract Claims: Claim One, for Breach of Joint Venture**

20     **Agreement; Claim Two, for Breach of Agency Agreement; and Claim Six, for**

21     **Implied Indemnity**

22  3.  In late 2002 or early 2003, Wu and Doucette entered into an oral agreement to

23     establish an export-import business venture together**.**  The essential terms of the

24     agreement called for Wu to obtain suppliers in China of certain medical equipment,

25     including (but not limited to) vinyl gloves; for Doucette to obtain buyers of the goods

26     in the United States; for Wu to obtain samples of the goods and negotiate prices

27     with the Chinese suppliers; for Doucette to solicit orders and negotiate prices with

28

the U.S. buyers; for Wu and Doucette to confer with one another and confirm the mutual agreeability of the suppliers' sales and buyers' purchase prices; for Wu to monitor the quality and shipment of the goods from the Chinese suppliers; for Doucette to prepare Purchase Orders reflecting the orders from U.S. buyers and transmit those Purchase Orders to Wu, who was to translate them accurately into Chinese and then transmit them to the Chinese suppliers; for Doucette Medical to obtain the payments directly from the U.S. buyers; for Doucette Medical to pay the Chinese suppliers (or their trading companies) directly once shipment had been received; and for Wu and Doucette to divide the profits from the transactions, i.e., the difference between the price paid by the U.S. buyer and the Chinese supplier.[1] Wu and Doucette each would be responsible for paying her own business expenses incurred in connection with her respective responsibilities.

4.   The documents created by the parties during the regular course of their business dealings during the period between 2003 and August 2006 confirm they indeed transacted business as agreed upon and described above.  (See Exs. 19-22 [Bills of Lading, Invoices, and Purchase Orders confirming transactions among Chinese suppliers, U.S. buyers, and Doucette Medical].)

5.   Doucette, on behalf of Doucette Medical, and Wu agreed that Wu would be authorized to act on behalf of Doucette Medical when negotiating with Chinese suppliers and doing the other acts described above in furtherance of the agreement between the parties.  For example, during the initial discussions about establishing an import-export business together, Doucette referred to the proposed relationship with Wu as a "partnership."  Furthermore, throughout the course of the relationship, Doucette Medical and Doucette routinely referred to Wu as Doucette Medical's authorized representative and Wu's office as Doucette's "Shanghai office."  (See

---

[1]Wu and Doucette usually divided the profits evenly, i.e., splitting them on a 50% - 50% basis, but sometimes on another, agreed upon, percentage division.

Exs. 12, 13, 14 & 17 [Emails from Doucette to business contacts referring to Doucette Medical's "business office in Shanghai" and Julia Wu as Doucette's "partner", and referring to the "partnership"];  Ex. 27 [Email from Doucette to Wu ("...like you I felt this was a partnership with each of us in charge of our country's work.").])   During her trial testimony, Doucette acknowledged the significant business advantage that inured to Doucette Medical in having an authorized representative resident in China, fluent in Chinese, and familiar with Chinese business practices.  At times, Wu used an email address indicating her affiliation with Doucette Medical ("Julia@doucettemedical.com") with Doucette Medical's knowledge and approval.  (See Ex. 13.)  Wu signed Purchase Orders on behalf of Doucette Medical with Chinese manufacturers for over three years, and Doucette admitted in her trial testimony that Wu had the authority to bind Doucette Medical when she did so.  (Exs. 20-23, 53.)

6.    In late 2003, Wu obtained price quotes for, and samples of, vinyl gloves from a manufacturer known as Zibo Borui Plastic & Rubber Products Co. ("Borui"[2]), located in Zibo City, Shandong province, China.  After reviewing the samples and the prices quoted for the gloves, Doucette and Wu decided to use Borui as a supplier for their U.S. customers.

7.    On April 28, 2004, Doucette Medical entered into a Non-Circumvention Protection Agreement with Borui.  (Ex. 25.)  Doucette signed the Agreement on behalf of Doucette Medical; it provided that, as to all customers introduced to Borui by Doucette Medical, the excess of the price quoted or given to Doucette Medical to its customers above the price charged by Borui would be Doucette's "commission."

8.    In March 2005, Doucette Medical entered into a Marketing and Sales Cooperation Agreement with Borui.  (Ex. 26.)  Doucette signed the Marketing and Sales

---

[2]In her electronic and written messages, Doucette consistently misspells Borui as "Bouri."  (See Exs. 34-1, 35, 36, 39-1, & 45. )

Cooperation Agreement on behalf of Doucette Medical; it gave Doucette Medical exclusive sales rights in thirteen U.S. states for gloves manufactured by Borui, and established minimum order requirements beginning in March 2005.  In her trial testimony, Doucette admitted she would not have entered into the Marketing and Sales Cooperation Agreement had she not been satisfied with Borui's prior performance.

9. Beginning in the late fall of 2005, Borui's shipments of products to Doucette Medical's customers began to lag.  This caused tension between Wu and Doucette, and they discussed changing the form and nature of their business relationship. They did not do so, however.  (See Ex. 27.)

10. Doucette and Wu visited the Borui factory together in late 2005, and Doucette discussed the delivery problems with Borui's General Manager.  Nevertheless, the delays persisted. The incidence of untimely shipments from Borui increased during 2006, caused by a dispute between Borui's two main shareholders that eventually resulted in a split up of the business.  Wu told Doucette about the causes of the Borui problems, and Wu inspected the Borui factory more often to ensure that Borui was complying with its supply obligations; she reported to Doucette her conclusion that Borui was shipping to Doucette Medical's customers more than 70% of its production of medical gloves.

11. On April 6, 2006, Doucette sent a letter to Borui on behalf of Doucette Medical setting forth the latter's claims against the former.  (Ex. 40.)  By this time, although it had received payments from its U.S customers on shipments from Borui, Doucette Medical had withheld payment of $49,376.80 from Borui as a set-off against claims Doucette believed Doucette Medical could assert against Borui because of problems with untimely shipping and the quality of its vinyl gloves.  Included in that amount was $20,000 that Doucette Medical had to reimburse one of its customers, ProMed, for failure to deliver products timely which had been ordered but not

1    delivered by Borui.  As to the balance of the amount withheld from Borui for

2    products delivered by it to Doucette Medical's customers, Doucette's testimony was

3    too vague to form the basis for any set-off against amounts due and owing to Borui.

4    When cross-examined about the basis for the amounts she withheld from payments

5    owed to Borui under Purchase Orders admittedly fulfilled by the company, Doucette

6    repeatedly testified only "Everyone was calling me and complaining!" or "I was

7    getting complaints night and day" or similarly nonspecific statements.  Repetition

8    being no substitute for particularity, the Court found unconvincing Doucette's

9    testimony regarding the lack of quality in the goods shipped by Borui.  Doucette

10   provided no evidence in the form of written complaints, electronic messages or

11   testimony, from a single customer regarding the alleged shoddiness of Borui's

12   goods.

13   12.  Doucette and Wu discussed the April 6, 2006 letter before Doucette sent it to Borui,

14       and Wu stated she agreed with some but not all of the statements contained in it.

15       For example, Wu testified she disagreed with the statement in Exhibit 40 that

16       Doucette Medical was entitled to withhold payment due Borui for damage Doucette

17       Medical claimed had been caused by the loss of potential orders that might have

18       been placed but for Borui's tardiness in shipping.  Wu did agree with the payment of

19       $20,000.00 to ProMed, for ProMed's claims arising out of delayed shipments of

20       Borui's products to it.  Despite Wu's disagreement with Doucette's stated intent to

21       withhold monies owed to Borui, Doucette sent the letter to Borui.

22   13.  Wu was concerned that Borui might sue her as a result of the monies withheld from

23       it for shipments made to Doucette Medical's customers.  Wu consulted counsel,

24       who told her she needed to obtain explicit written authorization confirming she was

25       Doucette Medical's agent and had been acting for the company in connection with

26       the Borui transactions.  Neither Doucette nor Wu could recall whether or not such

27       written authorization previously had been provided to Wu at the outset of their

28

1    working relationship, but Doucette repeatedly promised Wu that Doucette would

2    provide Wu with a written Authorization Letter.  Doucette also assured Wu that

3    Borui would not sue Wu, and repeatedly represented that if Borui did sue, Doucette

4    would countersue Borui "for more," and in any event, Doucette and Doucette

5    Medical would "take total responsibility" for withholding payments to Borui.  (See

6    Exs. 39, 41, 55, 56, 57.)

7  14.    Borui responded to Doucette Medical's demand letter by writing to Wu, who

8    forwarded this response to Doucette and again asked for an Authorization Letter.

9    (Ex. 44.)  Doucette acknowledged that Doucette Medical had a direct contractual

10    obligation to Borui, and admitted Wu had no liability if Borui sued her because Wu

11    "never paid them[.]  [T]he money came out of my account and *I bought the product*."

12    (Ex. 45 (emphasis added).)

13  15.    Doucette continued to promise Wu that Doucette Medical would provide her an

14    Authorization Letter confirming her status as an authorized agent of Doucette

15    Medical for purposes of the Borui transactions.  Doucette instructed her assistant,

16    Sue Johnson, to draft such a letter and sign it for Doucette and send it to Wu.  [Ex.

17    52.]  After the signed Authorization Letter was sent to Wu, however, Doucette told

18    Wu not to use it, as Doucette wanted to make changes to it and consult a lawyer

19    about it.  Although Doucette continued to send assurances to Wu that she and

20    Doucette Medical would take responsibility for the Borui dispute, Doucette did not

21    send another Authorization Letter nor did she consent to Wu's use of the Letter

22    earlier sent.

23  16.    Borui sued Wu in Shandong Province, Zibo Zhangdian District People's Court ("the

24    Chinese court") for the failure to pay Borui for the goods delivered to Doucette

25    Medical's customers as set forth in the Purchase Orders negotiated and signed by

26    Wu on behalf of Doucette Medical.  (Ex. 106.)   Borui served Wu with the lawsuit on

27    June 20, 2006, along with notice that the Chinese court had frozen her access to

28

the cash in her bank accounts and had placed a lien on her ownership interest in her apartment in Shanghai.

17. Wu notified Doucette immediately of the lawsuit; Doucette at first reiterated her promises to assist in Wu's defense and to provide her with necessary documents to that end, including an Authorization Letter.  Doucette Medical's lawyer, Michael Chen, provided similar assurances to Wu.  (Exs. 83, 88, 89, 90.)

18. On July 29, 2006, Chen advised Doucette that Doucette Medical should not provide a defense to Wu and should not give her an Authorization Letter.  (Ex. 96.) Doucette notified Wu of this by forwarding to her Chen's letter.  (Ex. 96-1.)  The only assistance Doucette or Doucette Medical gave Wu in defending the Borui lawsuit was to provide her with the original Sales and Marketing Cooperation Agreement and a copy of a single wire transfer receipt showing one payment made by Doucette Medical to Borui.

19. The Borui case was tried (on very short notice) on October 8, 2006 in Zibo City. After presentation of evidence and hearing from counsel, the Chinese court took the matter under submission, and on November 5, 2006, issued judgment in favor of Borui and against Wu.  (Ex. 109 [(Certified translation of Judgment].)  The Court awarded judgment to Borui in the amount of $126,878.40 plus fees and expenses of ¥13,199 and interest (in an unstated amount),[3] against Wu.

20. On October 26, 2006, Doucette, acting on behalf of Doucette Medical, authorized Chen to place a legal notice in a Beijing newspaper, the *Legal Daily* ("the *Legal Daily* notice" or "the notice".  (Ex. 107.)  The notice stated:

> Doucette Medical Supply LLC of the United States solemnly declares    that    [Julia    Wu]    (Identification    No.: 440505196902201441) has never been employed by this

---

[3]Plaintiff is not seeking prejudgment interest on any of the amounts awarded against her by the Chinese courts, as the interest rate imposed has never been established.

1            company, is not a sales representative of this company,

2            and has no right to represent or act as an agent for this

3            company in any action which is legally binding. We request

4            that our customers and the companies we do business with

5            make their own careful investigations in the course of their

6            business.

7    Id.

8    21.   Doucette placed the *Legal Daily* notice after a meeting between Chen and the

9         General Manager of Borui.  The Court finds Doucette, acting through her lawyer,

10        colluded with Borui to increase the latter's chances of succeeding in its litigation

11        against Wu, and Doucette Medical published the *Legal Daily* notice as a result of

12        this collusion.

13   22.   As Doucette admitted in her trial testimony, the notice was published for the

14        purpose of contradicting the evidence Wu had presented to the Chinese court

15        during the first trial in early October 2006, that she was an authorized representative

16        of Doucette Medical.  In publishing the notice Doucette intended to, and did, act to

17        further only her own interests and those of her company, Doucette Medical, rather

18        than the interest of the joint business enterprise.  In fact, Doucette testified that she

19        caused the notice to be published because she did not want to be "on the hook

20        financially for the claims Borui was making" in the Chinese court against Wu.

21   23.   Wu sought review of the November 5, 2006 Judgment in a higher court, and

22        obtained a new trial which was conducted on January 25, 2007.  Again, the Chinese

23        court heard from counsel and admitted documentary evidence, including new

24        evidence in the form of the *Legal Daily* notice.  (Ex. 107).   On February 6, 2007, the

25        court issued its Judgment in favor of Borui and against Wu, expressly citing the

26        notice published in the *Legal Daily* as evidence of Wu's responsibility for the monies

27        withheld from Borui for the goods shipped to Doucette Medical's U.S. customers.

28

(Ex. 110 [Certified translation of Judgment].)  The Chinese court awarded Borui the original Judgment amount ($126,878.40 plus fees and expenses of ¥13,199 and interest) plus a "litigation fee" of ¥12,749 against Wu.

24.   Wu filed an appeal of the February 6, 2007 Judgment to a higher court, but the appeal was not accepted for hearing, and the February 6, 2007 judgment is now final.

25.   Wu incurred reasonable expenses in connection with defending the Borui lawsuit, including travel expenses to meet with her defense lawyers, legal fees, and court costs.  These expenses totaled ¥162,919.30; as of February 16, 2010 that amount converts to $23,897.92.

26.   Neither Doucette nor Doucette Medical has reimbursed Wu for any expenses incurred in defending the Borui lawsuit in the Chinese courts.

27.   On May 22, 2007, May 23, 2007 and November 11, 2008, the Chinese court garnished the following amounts from bank accounts of Wu in partial satisfaction of the Borui judgment:  ¥154,473.99; ¥287,385.48; and ¥48,000.00, respectively. Converted at the prevailing exchange rate on those dates, the dollar amounts of the garnishments are $20,219.64; $37,624.76; and $7,047.01, respectively.  Neither Doucette nor Doucette Medical has reimbursed Wu for any of these amounts, nor for the balance remaining on the judgment rendered in the Chinese court.  That balance amount is ¥560,140.53 as of February 16, 2010 (the first day of trial in this case), or $82,164.57.

**Claim Three:  Breach of Fiduciary Duty**

28.   Throughout the course of their joint business enterprise, i.e., from late 2002 or early 2003 through August 15, 2006, Wu and Doucette Medical shared a business relationship requiring mutual trust and confidence.  Each relied on the other to carry out her respective obligations as agreed upon at the outset of their joint enterprise,

as set forth in Finding of Fact Nos. 3, 4, and 5, above.  Each relied on the other to place the success of the joint enterprise above her or its own personal interests.

29.  Doucette Medical, acting through and by its sole shareholder and owner, Doucette, breached that required trust and confidence, and failed to act with the required good faith towards Wu, by:

a.  withholding amounts due to Borui under the Purchase Orders duly executed by Wu on behalf of the joint enterprise;

b.  denying that Wu was authorized to act on behalf of Doucette Medical in negotiating and executing Purchase Orders with Borui during the period from late 2002 or early 2003;

c.  publishing the statements in the *Legal Daily* newspaper that Wu was not authorized to act on behalf of Doucette Medical and that she had not been an authorized employee of Doucette Medical, and warning others to investigate carefully any such claims by Wu before doing business with her; taken together, the statements clearly implied the false conclusion that Wu had acted without or beyond authority when transacting business on behalf of Doucette Medical as part of the joint business venture, particularly if the notice was read by anyone with knowledge of the facts and circumstances surrounding the disputed, unpaid Borui Purchase Orders;

d.  failing to assume the defense of the Borui lawsuit against Wu, even after acknowledging that Doucette Medical, not Wu, was the responsible party, (see Exs. 83, 88, 89, 90);

e.  failing to assist Wu in defending against the Borui lawsuit, e.g., failing to provide her with evidence that she was authorized to act on behalf of Doucette Medical when negotiating orders with Borui and executing contracts for orders placed by Doucette with Borui during the times in question; failing to provide her with the documents evidencing the payments made by

11

Doucette Medical for the shipments made by Borui, as well as other documentary evidence needed to defend the case; and failing to reimburse her for reasonable costs she incurred in defending the lawsuit; and

f.      putting the interests of Doucette Medical before those of the joint enterprise by taking the steps described in subparagraphs (a) through (e), above, to ensure that Wu, and not Doucette Medical or the joint enterprise, would be held liable in the Chinese court for the Borui lawsuit.

30.   Wu suffered emotional distress, manifested in sleeplessness, anxiety, and fear for a period of nearly two years caused by the acts and omission of Doucette and Doucette Medical described above, <u>i.e.</u>, failing to pay Borui for amounts owed under the Purchase Orders negotiated on behalf of the joint enterprise, failing to defend Wu against the Borui lawsuit, and failing to assist Wu in defending the lawsuit herself.

**Claim Four:  Defamation**

31.   The October 26, 2006 written notice Doucette caused to be published in the *Legal Daily* contained the following statements about Wu: "[Julia Wu] <u>has never been employed</u> by this company, <u>is not</u> a sales representative of this company, and <u>has</u> no right to represent or act as an agent for this company in any action which is legally binding.  We request that our customers and the companies we do business will make their own careful investigations in the course of their business."  (Ex. 107) (emphasis added).)  According to the defense, these statements are not actionable because at the time of publication, all of them were factually correct.  Indeed, neither at the time of publication nor at any other time when Wu and Doucette were doing business together was the former an "employee" of the latter, and as of October 26, 2006, Wu was no longer a sales representation of Doucette Medical nor its authorized representative agent.

32. The statements published in the *Legal Daily* were not false on their face, but because of facts and circumstances known to readers of the statements, the statements tended to injure Wu in her occupation, to expose her to shame and mortification, and to discourage others from associating or dealing with her. For example, any reader who knew of the claims asserted by Borui against Wu in the Chinese court reasonably would have understood the notice as a complete disavowal by Doucette Medical of Wu's position in that litigation that she had acted as Doucette Medical's authorized representative in transacting business with Borui. In other words, taken as a whole, with knowledge of the facts and circumstances of the Borui lawsuit, the statements conveyed false information about Wu, and exposed her to shame, tended to injure her in her occupation and to discourage others from associating or dealing with her.

33 Such readers existed, in fact; the Chinese court relied on the *Legal Daily* notice, understood it as intended by Doucette Medical, and cited it in concluding that Wu was not and *had never been* an authorized representative of Doucette Medical. (Ex. 110, p. 10.)

34. Doucette failed to use reasonable care to determine the truth or falsity of the statements in the *Legal Daily* notice. In fact, Doucette knew the import of the statements was false because (1) she knew that Wu had in fact been an authorized representative of Doucette Medical at all times when Wu had undertaken any acts purporting to act on its behalf, (2) she knew that Borui had sued Wu for the unpaid Doucette Medical Purchase Orders and had won a judgment against her that Wu was appealing, (3) she knew a key issue in the Borui litigation was whether or not Wu was authorized to act as Doucette Medical's representative when the disputed Purchase Orders were executed, and (4) she was motivated at least in part to publish the notice by her desire to shift liability for the unpaid amounts owed to Borui from Doucette Medical to Wu.

13

35. Wu suffered shame and mortification as a result of the libelous publication in the *Legal Daily*.  After the publication occurred, she felt frightened, and worried that she would lose at the second trial or be arrested, or both.  She worried about being arrested because the notice made her business activities on behalf of Doucette Medical and the joint business enterprise sound illegal and made her feel "like a criminal."

36. The only evidence of injury to her business or profession resulting from the *Legal Daily* publication was Wu's testimony that she "lost 70% to 80% of her business" after the notice was published.

37. The only evidence Wu produced as to Doucette Medical's financial condition was the testimony adduced from Doucette regarding the increase in the company's gross receipts in the years following 2006.  The only evidence Wu produced as to Doucette's financial condition was the amount of her salary in the year preceding the trial.

**Claim Five:  Intentional Infliction of Emotional Distress Claim**

38. Wu suffered emotional distress, manifested in sleeplessness, anxiety, and fear for a period of nearly two years caused by the acts and omission of Doucette and Doucette Medical described above, i.e., the failure to pay Borui for amounts owed under the Purchase Orders negotiated on behalf of the joint enterprise, the failure to defend Wu against the Borui lawsuit, and the failure to assist Wu in defending the lawsuit herself.

**AFFIRMATIVE DEFENSES TO THE COMPLAINT**

14

39.    Defendants preserved no affirmative defenses in the Final Pretrial Conference

Order.  Defenses not set forth in the Pretrial Conference Order are deemed waived.

The Pretrial Conference Order supersedes the pleadings and controls the course of

the litigation thereafter.  Fed. R. Civ. P. 16(d); Nw. Acceptance Corp. v. Lynnwood

Equip., Inc., 841 F.2d 918, 924 (9th Cir. 1988).  "A defendant must enumerate its

defenses in a pretrial order even if the plaintiff has the burden of proof."  El-Hakem

v. BJY Inc., 415 F.3d 1068, 1077 (9th Cir. 2005) (citation omitted);  Operating

Eng'rs Pension Trust v. Cecil Backhoe Serv., 795 F.2d 1501, 1507 (9th Cir.1986)

(failure to raise argument in pretrial conference order or at trial was waiver); S. Cal.

Retail Clerks Union & Food Employers Joint Pension Trust Fund v. Bjorklund, 728

F.2d 1262, 1264 (9th Cir.1984) (failure to include issue in pretrial order constituted

waiver, even though raised earlier in the proceeding).   Accordingly, Defendants

waived the statute of limitation defense they attempted to raise in their

Memorandum of Contentions of Law as to Plaintiff's breach of contract claims.

Moreover, the Court finds the claims were timely filed, as this action was filed

December 4, 2007, within two years of the accrual date, which at the earliest was

April 2006, as set forth above in Finding of Fact No. 29, above.  To the extent

Defendants claim that they published the notice in the *Legal Daily* on the advice of

counsel, they have not pled an advice of counsel defense.  The Court does not

opine on whether or not such a defense is available in a libel action, but merely

notes that even if it is, it has been waived here.  See Fed.R.Civ.P. 16(d).

**THE COUNTERCLAIMS**

15

**Counterclaim Two[4]:  Common Law Trade Name Infringement and Misappropriation**

40. Doucette Medical failed to produce evidence that Wu infringed on or misappropriated Doucette Medical's trade name.  Indeed, the evidence established that Doucett and Doucette Medical knew Wu was using the Doucette Medical name when transacting business in China, and Wu was authorized to do so on behalf of the joint business enterprise formed by Wu and Doucette Medical.  Doucette and Wu specifically agreed that Wu would negotiate with Chinese sellers and then execute Purchase Orders using the name "Doucette Medical."   This was the method by with the joint business enterprise operated for more than three years.  Doucette Medical produced no evidence of confusion by any customers regarding the source or origin of any services or goods.

**Counterclaim Three:  Fraud**

41. Doucette claims Wu falsely represented she was authorized to act as its authorized representative.  It adduced no such evidence at trial, however.  The evidence, testimonial and documentary, established that at all times from the beginning of 2003 through August, 2008, Wu was authorized to do the things she did on behalf of Doucette Medical – negotiating prices with Chinese manufacturers, inspecting factories and goods, translating Purchase Orders, etc. – and never exceeded that authority.

42. To the extent Doucette Medical bases its fraud counterclaim on a theory that Wu intentionally or negligently misrepresented the quality of goods produced by Borui, or Borui's ability to fulfill its obligations to deliver goods timely, Counterclaimant has failed to meet its burden of proof.  At the time the joint business enterprise

---

[4]On the first day of trial, Doucette Medical announced that it was dismissing its First Counterclaim, for violation of the Lanham Act, 15 U.S.C. § 1125.

1    conducted by Doucette Medical and Wu first contracted with Borui, both Wu and

2    Doucette inspected samples of Borui's goods and were satisfied with the quality.

3    Furthermore, Doucette admitted she would not have entered into the Marketing and

4    Sales Cooperation Agreement or the Non-Circumvention Protection Agreement

5    with Borui if she had not been satisfied with the company's performance initially.

6    Finally, to the extent Doucette Medical relies to support its fraud counterclaim on the

7    evidence that Wu presented to the Chinese court that she was authorized to act on

8    behalf of Doucette Medical, that evidence would not constitute a "false

9    representation."  Wu was in fact authorized to act as Doucette Medical's

10   representative, as Doucette herself admitted many times during her trial testimony.

11   43.   Doucette Medical failed to meet its burden of proof regarding damages caused by

12         any intentional or negligent misrepresentations by Wu.  If the alleged

13         misrepresentation consisted of false statements regarding the quality of goods

14         produced by Borui, or its ability to deliver goods timely, Doucette's evidence

15         regarding the damage to her business caused thereby was insufficient.  As set forth

16         in Finding of Fact No. 11, above, Doucette's testimony was far too vague, as well as

17         contradictory and disjointed, to form the basis for any finding that alleged

18         misrepresentations about these matters caused damages to Doucette Medical.

19         When examined on this subject, Doucette repeatedly testified only "Everyone was

20         calling me and complaining!" or "I was getting complaints night and day" or similarly

21         nonspecific statements.  Not only was this testimony regarding the impact on

22         Doucette Medical's business caused by the delayed delivery and poor quality of

23         Borui's products completely unconvincing, but  Doucette Medical provided no

24         evidence in the form of written complaints, electronic messages or testimony from a

25         single customer on the issue of the alleged shoddiness of the Borui goods.

26   44    Doucette Medical's evidence regarding lost income as a result of any

27         misrepresentations, including any about the quality of the Borui goods, was

28

insufficient and unconvincing.   Doucette admitted that in general, during the time period in question (2005 and 2006), demand for vinyl gloves produced in China exceeded supply.  She testified her customers stopped ordering vinyl gloves from Doucette Medical after 2006, but provided no evidence why this was so.  The evidence she adduced of the company's gross receipts, and their increase in the years following the dissolution of the business venture with Wu, proves nothing relevant, as she introduced no evidence of Doucette Medical's net profit or income.  Thus, Doucette Medical failed to prove any resulting damages as well.

**Counterclaim Four:  Defamation**

45. Counterclaimant failed to meet its burden that Doucette Medical suffered damages resulting from any defamatory statements published or uttered by Wu.  As set forth in Finding of Fact Nos. 42 and 43, above, Doucette Medical adduced no convincing evidence Doucette Medical's business suffered as a result of any act by Wu, thus failing to prove damages.  Moreover, Doucette's testimony regarding slanderous statements uttered by Wu was deficient, and Counterclaimant produced no witnesses to testify of the publication of false statements.

46. To the extent Doucette Medical bases its defamation counterclaim on a libel theory, again its evidence was insufficient.  For example, Doucette testified that Wu had written letters to three of  Doucette Medical's customers, Quantum, RJM, and Cascade.  Doucette Medical failed to introduce any such letters into evidence, so that their allegedly defamatory contents cannot be confirmed, nor did any recipients testify they had received such written communications from Wu.  Furthermore, no damages were proven under this theory either; as to RJM, Doucette testified only that RJM filed for bankruptcy protection at least two years earlier, that the letter Wu sent to Quantum did not affect her business relationship with Quantum, and as to

18

1    Cascade, only that she was not doing business with that company as of the time of

2    trial.

3

4    **Counterclaim Five, for Intentional Interference with Prospective Economic**

5    **Advantage**

6    47    Doucette Medical failed to meet its burden of proving that Wu intentionally acted to

7    disrupt the company's relationship with any third party, including its customers.  As

8    set forth in Finding of Fact Nos. 42 through 45, above, Doucette failed to prove that

9    Wu published false statements about Doucette Medical, or did any other

10   independently wrongful act knowing that it was certain or substantially certain to

11   interfere with Doucette Medical's prospective economic advantage.

12   48.   Doucette Medical also failed to prove any actual disruption of a relationship with a

13   third party.  <u>See</u> Finding of Fact Nos. 34 and 35, above.

14

15                          **II.  CONCLUSIONS OF LAW**

16   **Jurisdiction**

17   1.    The Court has jurisdiction over this action under its diversity jurisdiction, 28 U.S.C. §

18   1332 (a).  Personal jurisdiction exists over Defendants because they reside in

19   Riverside County, California, within the Central District of California and the Eastern

20   Division thereof.  (PTCO ¶ 2.)  Venue is properly laid in the Central District of

21   California under 28 U.S.C. § 1391(a)(1)(3) because all Defendants reside in and are

22   subject to personal jurisdiction in this Court.

23   2.    The Court applies California substantive law to resolve the claims alleged.  <u>Erie R.</u>

24   <u>Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938); <u>St. Paul Fire and Marine Ins. Co. v.</u>

25   <u>Weiner</u>, 606 F.2d 864, 867 (9th Cir. 1979) (applying California substantive law for

26   an action brought in a district court in California pursuant to its diversity jurisdiction);

27

28

19

State Farm Mut. Auto. Ins. Co. v. Khoe, 884 F.2d 401, 405 (9th Cir. 1989) (applying California substantive law to contract action).

3.   Plaintiff and Counterdefendant Julia Wu timely demanded a jury trial.  Defendants and Counterclaimant did not make a proper jury trial demand in their Answers or Counterclaim, as the demand was not "separately signed" as required by Local Rule 38-1 of the Local Rules of the U.S. District Court, Central District of California. At the Pretrial Conference conducted on November 16, 2009, Defendants/Counterclaimants had not filed any of the following required documents (1) a Memorandum of Contentions of Fact and Law;(2) Proposed Exhibit List or their portions of a Proposed Joint Exhibit List submitted by Plaintiff/Counterdefendant; (3) a Proposed Pretrial Conference Order or their sections of the Proposed Pretrial Conference Order timely submitted by Plaintiff/Counterdefendant.  The Plaintiff's Proposed Pretrial Conference Order stated "Plaintiff waives a jury [trial]."   Counsel for Plaintiff stated on the record at the Pretrial Conference that Plaintiff/Counterdefendant waived her right to jury trial and withdrew her jury demand, and counsel for Defendants/Counterclaimant made no objection to the waiver.  As no proper jury demand had been made by Defendants/Counterclaimant, the Court set the trial as a nonjury trial, but informed counsel that he could promptly bring a motion for relief from that order, including a request for an Order Shortening Time for hearing such a motion.  No such motion was brought.

### CLAIMS IN THE COMPLAINT

**First Claim, for Breach of Contract:  Joint Venture Agreement**

4.   A plaintiff seeking to recover for breach of contract must prove (1) the existence of the contract; (2) the plaintiff's performance under the contract or excuse for any nonperformance; (3) the defendant's breach of the contract; and (4) the resulting

1   damages suffered by the plaintiff.  <u>CDF Firefighters v. Maldonado</u>, 158 Cal. App. 4th

2   1226, 1239 (2008).

3   5.   Wu carried her burden of proving by a preponderance of the evidence the existence

4        of a contract between herself and Doucette Medical to carry on a joint venture, <u>i.e.</u>,

5        "an undertaking by two or more persons jointly to carry out a single business

6        enterprise for profit."  <u>580 Folsom Assoc. v. Prometheus Dev. Co.</u>, 223 Cal. App. 3d

7        1, 15 (1990).  The agreement between the parties was partly oral, and  partly

8        implied in fact.  <u>See</u> Finding of Fact Nos. 3, 4, and 5, above.  An agreement to carry

9        on a joint venture need not be reduced to writing, <u>see</u>, <u>e.g.</u>, <u>Replogle v. Ray</u>, 48 Cal.

10       App. 2d 291, 295-96 (1941).  The parties had joint control over their venture, as

11       their agreement and their actual practice was for both Wu and Doucette Medical to

12       consult and agree on the price to be paid to the Chinese manufacturer, and on the

13       price to be paid by the U.S. customer, with neither Wu nor Doucette having sole

14       control over either decision; the parties shared the profits of their venture, usually on

15       an equal basis but sometimes on a different percentage if agreed; and each party

16       had an ownership interest in the venture.  Thus, all the requirements for creation of

17       a joint venture were met.  <u>Orosco v. Sun-Diamond Corp.</u>, 51 Cal. App. 4th, 1659,

18       1666 (1997) (citing <u>580 Folsom Associates</u>, 223 Cal. App. 3d at 15-16).

19  6.   Wu carried her burden of proving, by a preponderance of the evidence, that she

20       performed her obligations under the contract to carry on a joint venture.  She

21       obtained manufacturers' samples, negotiated prices with Chinese sellers, received

22       and translated Purchase Orders, confirmed and translated order and shipping

23       specifications with manufacturers and shippers, inspected factories during the

24       production process and final shipment of goods, conferred and agreed with

25       Doucette regarding the prices to be paid by the Chinese sellers and U.S. buyers

26       and the split of the profits from these transactions between the two parties to the

27       joint venture..

28

7.  Wu proved, by a preponderance of the evidence, that Doucette and Doucette
    Medical breached their obligations under the agreement to carry on a joint venture,
    by:

    a.  withholding amounts due to Borui under the Purchase Orders duly and
        properly executed by Wu on behalf of the joint venture;

    b.  denying to third parties that Wu was authorized to act on behalf of Doucette
        Medical in negotiating and executing Purchase Orders with Borui during the
        period from 2003 through August 2006;

    c.  publishing in the *Legal Daily* newspaper in Beijing, China, the false
        statements that Wu was not authorized to act on behalf of Doucette Medical
        and that she had not been an authorized employee of Doucette Medical, and
        the warning that others should investigate carefully any such claims by Wu
        before doing business with her;

    d.  failing to assume the defense of the Borui lawsuit against Wu, even after
        acknowledging that Doucette Medical, not Wu, was the responsible party;

    e.  failing to assist Wu in defending against the Borui lawsuit, e.g., failing to
        provide her with evidence that she was authorized to act on behalf of
        Doucette Medical when negotiating orders with Borui and executing contracts
        for orders placed by Doucette with Borui during the times in question; failing
        to provide her with the documents evidencing the payments made by
        Doucette Medical for the shipments made by Borui, as well as other
        documentary evidence needed to defend the case; and failing to reimburse
        her for expenses reasonably incurred in defending the case;

    f.  failing to reimburse Wu for the damages she suffered in defending and
        satisfying partially the judgment obtained against her by Borui in China, and
        for the amounts she remains obligated to pay Borui to satisfy that judgment;
        and

22

g.      by putting the interests of Doucette Medical before those of the joint venture by taking the steps described in subparagraphs (a) through (f), above, to ensure that Wu, and not Doucette Medical or the joint enterprise, would be held liable in the Chinese court for the lawsuit brought by Borui.

8.      Wu suffered damages caused by Doucette's and Doucette Medical's breach of the joint venture agreement, and proved those damages by a preponderance of the evidence, in the total amount of **$160,953.90**, calculated as follows:  The total amount of the final judgment rendered by the Chinese court against Wu was **$147,055.98** (the original judgment amount of $126,878.40 plus fees and costs assessed in the two Chinese court proceedings); Wu incurred reasonable expenses of **$23,897.92** in defending the Borui lawsuit; these two amounts total **$170,953.90**. The judgment amount rendered by the Chinese court included liability for **$126,878.40** of unpaid invoices for goods received by Doucette Medical's customers for which Doucette Medical received payment but failed to pay Borui.  It would not have been necessary for Wu, or the joint venture, to defend the Borui lawsuit in the Chinese courts had not Doucette Medical wrongfully withheld payments from Borui.  The only amount shown to have been properly borne by the joint venture was the $20,000 payment to the customer ProMed for delayed delivery of Borui product.  Wu's share of that payment by the joint venture is **$10,000.00**, which is properly credited against the judgment rendered in the Chinese court.

**Claim Two, for Breach of Contract:  Breach of Agency Agreement**

9.      Wu asserts, in the alternative, a breach of contract claim based on a theory that the agreement between the parties was an agency agreement.  As set forth above, however, although the evidence in this case clearly established that Wu was authorized to act on behalf of Doucette Medical as its agent or authorized representative, the relationship between the parties extended far beyond, and was

1    inconsistent with, that of agent (Wu) and principal (Doucette and Doucette Medical).

2    For example, a principal has an obligation to pay an agent for services performed

3    by her, see Restatement (Second) of Agency (1958) § 441 (Duty to Pay

4    Compensation).  Here, both Doucette and Wu testified that their agreement was not

5    that Doucette would pay Wu for services rendered as the former's agent (or

6    Doucette Medical's agent), but that after both Wu and Doucette had performed their

7    respective duties under their agreement, they would split the profits.  Moreover,

8    both Wu and Doucette testified, and wrote messages to each other to the same

9    effect, i.e., that neither was the other's superior.  In light of the evidence, therefore,

10   Wu has not proven by a preponderance of the evidence the existence of an

11   agreement to perform solely as Doucette or Doucette Medical's agent.

12

13   **Claim Three, for Breach of Fiduciary Duty**

14   10.   Those engaged in a joint venture hold a fiduciary duty towards one another.  Sime

15        v. Malouf, 95 Cal. App. 2d 82, 97 (1949).  A fiduciary must act "with the highest

16        good faith towards" her co-joint venturer with respect to the affairs of the joint

17        venture.  Pellegrine v. Weiss, 165 Cal. App. 4th 515, 524 (2008).  Doucette acting

18        on behalf of her wholly owned company Doucette Medical breached that duty

19        towards Wu, by:

20        a.   failing to pay amounts due to Borui under the Purchase Orders duly

21             negotiated and executed by Wu on behalf of the joint venture;

22        b.   denying to third parties that Wu was authorized to act on behalf of Doucette

23             Medical in negotiating and executing Purchase Orders with Borui during the

24             period from 2003 through August 2006;

25        c.   publishing in the *Legal Daily* newspaper in Beijing, China, the false

26             statements that Wu was not authorized to act on behalf of Doucette Medical

27             and that she was not been an authorized employee of Doucette Medical, and

28

24

1        the warning that others should investigate carefully any such claims by Wu

2        before doing business with her;

3    d.    failing to assume the defense of the Borui lawsuit against Wu, even after

4        acknowledging that Doucette Medical, not Wu, was the responsible party;

5    e.    failing to assist Wu in defending against the Borui lawsuit, e.g., failing to

6        provide her with evidence that she was authorized to act on behalf of

7        Doucette Medical when negotiating orders with Borui and executing contracts

8        for orders placed by Doucette with Borui during the times in question; failing

9        to provide her with the documents evidencing the payments made by

10       Doucette Medical for the shipments made by Borui, as well as other

11       documentary evidence needed to defend the case;

12   f.    failing to reimburse Wu for the damages she suffered in defending and

13       satisfying partially the judgment obtained against her by Borui in China, and

14       for the amounts she remains obligated to pay Borui to satisfy that judgment;

15       and

16   g.    by putting the interests of Doucette Medical before those of the joint venture

17       by taking the steps described in subparagraphs (a) through (f), above, to

18       ensure that Wu, and not Doucette Medical or the joint enterprise, would be

19       held liable in the Chinese court for the lawsuit brought by Borui.

20   11.   "The fact that persons engaged in a joint venture may quarrel or be at odds over the

21   business in which they are associated, . . . does not as a matter of law relieve them

22   of their fiduciary duties." Sime, 95 Cal. App. 2d at 97; (citations omitted).

23   Furthermore, where a corporation is a member of a joint venture, the person who

24   exercises complete control over the corporation's affairs is responsible for its breach

25   of the fiduciary duty. Id. at 96. Thus, although the joint venturers here were at odds

26   once the problems developed at the Borui factory, this dispute did not excuse

27

28

1    Doucette's acts and omissions described above.  Furthermore, her acts and

2    omissions are imputed to Doucette Medical.

3    12.   Wu suffered damages as a result of the breach of fiduciary duty in the amount of

4          **$160,953.90**, calculated as set forth in paragraph 8, above.  In addition, Wu

5          suffered emotional distress damages of **$100,000.00** caused by the breach of the

6          fiduciary duty by Doucette and Doucette Medical, manifested in anxiety,

7          sleeplessness, and distress lasting for many months.  (See Finding of Fact No. 30,

8          above.)  A plaintiff may recover emotional distress damages sustained as a result of

9          a breach of fiduciary duty.  See Jahn v. Brickey, 168 Cal. App. 3d 399, 406-07

10         (1985).   Wu's total damages for her breach of fiduciary duty claim are **$260,953.90.**

11

12         **Claim Four, for Defamation**

13   13.   In order to recover on a claim for libel per quod, a plaintiff must prove that (1) the

14         defendant made a written statement to person other than the plaintiff; (2) that the

15         readers reasonably understood that the statement was about the plaintiff; (3) that

16         because of the facts and circumstances known to the readers of the statement, the

17         statements tended to injure the plaintiff in her occupation, or to expose her to

18         hatred, contempt, ridicule, or shame, or to discourage others from associating or

19         dealing with her; (4) that the defendant failed to use reasonable care to determine

20         the truth or falsity of the statement; (5) that the plaintiff suffered harm to her

21         property, business, profession or occupation; and (6) that the statement was a

22         substantial factor in causing the plaintiff's harm.  Cal. Civ. Code §§ 45a, 48a(4)(b);

23         Palm Springs Tennis Club v. Rangel, 73 Cal. App. 4th 1, 5 (1999).

24   14.   Wu proved the first four elements by a preponderance of the evidence.  Defendants

25         caused to be published the *Legal Daily* notice explicitly naming Wu, thus satisfying

26         the first two elements.  The next two elements are satisfied as well; as a result of

27         the facts and circumstances surrounding the Borui litigation against Wu, the

28

26

statements tended to, and did, injure Wu in her occupation, and caused her to suffer shame, as well as serving to discourage others from associating or dealing with her.  In fact, the publication expressly warned third parties to "investigate carefully" before transacting business with Wu.  Doucette and Doucette Medical knew of the falsity (by implication) of the published statement.  She failed to establish by a preponderance of the evidence the fifth element, that she suffered injury in her business, profession or occupation, however.

15.   Wu failed to meet her burden of proof that she suffered injury in her business or profession because of the publication of the notice.  Her testimony that she lost 70 to 80% of her business following the publication does not suffice, because it remains unclear whether that "loss of business" referred solely to a loss of clients caused by the publication, or whether it referred to the loss of business resulting from the end of the joint venture operated by Doucette Medical and Wu, or some combination of the two.  Furthermore, Wu offered no evidence, documentary or testimonial, regarding the amount of lost income or net profits she suffered as a result of the *Legal Daily* publication.  Therefore, Wu is not entitled to judgment in her favor on this claim.

**Claim Five, for Intentional Infliction of Emotional Distress**

16.   In order to establish a claim for intentional infliction of emotional distress under California law, a plaintiff must show (1) extreme and outrageous conduct by the defendant; (2) intention to cause, or reckless disregard of the probability of causing, emotional distress; (3) severe emotional suffering; and (4) actual and proximate causation of the emotional distress.   King v. AC & R Adver., 65 F. 3d 764, 769 (9th Cir. 1995); see also Cole v. Fair Oaks Fire Protection Dist., 43 Cal. 3d 148, 155 n.7 (1987).  "Conduct, to be outrageous, must be so extreme as to exceed all bounds of that usually tolerated in a civilized society."   King, 65 F. 3d at 770.

27

17.  The acts of Doucette and Doucette Medical in failing to assume the defense of the Borui lawsuit, failing to assist Wu in defending against the Borui lawsuit, and denying her authority to act on behalf of Doucette Medical, all caused Wu emotional distress.  (See Finding of Fact No. 38.)   While reprehensible, however, none of these acts or omissions rises to the level of extreme, outrageous conduct outside the bounds of civilized society.  Thus, Wu fails to demonstrate that Doucette's and Doucette Medical's conduct satisfy the first requirement for a claim of intentional infliction of emotional distress, and she is not entitled to judgment on this claim.

**Claim Six, for Implied Contractual Indemnity**

18.  Wu is not entitled to recover under her claim for implied contractual indemnity. "Implied contractual indemnity is applied to contract parties and is designed to apportion loss among contract parties based on the concept that one who enters a contract agrees to perform the work carefully and to discharge foreseeable damages resulting from that breach." Smoketree-Lake Murray, Ltd. v. Mills Concrete Constr. Co., 234 Cal. App. 3d 1724, 1736 (1991).  It is a form of equitable indemnity, and provides for the apportionment of liability among parties who are partially liable for breach of contract.  Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp., 148 Cal. App. 4th 937, 974 (2007).  Wu is not claiming that she and Doucette jointly breached a contractual obligation to a third party; rather, she is claiming Doucette Medical breached the joint venture contract described above. Accordingly, she is not entitled to recover under a theory of implied contractual indemnity.

**Punitive Damages**

19.   To recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant acted with malice, oppression, or fraud.  Cal. Civ. Code § 3294(a).

20.   In addition, a plaintiff seeking punitive or exemplary damages must present evidence of the defendant's financial condition and ability to pay a punitive damages award.  Adams v. Murakami, 54 Cal. 3d 105, 115-16 (1991); Michelson v. Hamada, 29 Cal. App. 4th 1566, 1590-91 (1994).

21.   Wu seeks an award of punitive damages on three claims:  defamation, intentional infliction of emotional distress, and breach of fiduciary duty, but is entitled to recover on only the latter claim, for the reasons set forth above.  She has failed to introduce sufficient evidence to establish the financial condition of either Defendant.  Accordingly, she is not entitled to recover punitive damages here.

22.   Wu argues she is required to submit only "some evidence" of Defendants' financial condition, citing Adams, supra.  (Plf.'s Rev. Prop. Findings at 34.)  In fact, however, the Adams decision contains a lengthy analysis of the need for evidence regarding a defendant's financial condition, and all the cases it cites describe the financial condition evidence as evidence of a defendant's "net worth" or "net income."  Adams, 54 Cal. 3d at 112-13.  Nothing in that case supports an inference that the evidence presented here, i.e., evidence only of the corporate defendant's gross sales receipts or the individual defendant's salary would suffice to meet the burden of proving financial condition for the purposes of imposing punitive damages.  Michelson provides some further support for this conclusion; although the amount of punitive damages was reversed on appeal as excessive in that case, the type of evidence adduced as to the defendant's financial condition - financial statements and real property valuations - exemplifies the type of evidence needed to prove financial condition.

23. As Wu failed to meet her burden of proving the financial condition of either Doucette or Doucette Medical, she is not entitled to recover punitive damages on her breach of fiduciary duty claim.

**COUNTERCLAIMS**

**Second Counterclaim**: **Common Law Trade Name Infringement and Misappropriation**

24. "Liability for trademark infringement and unfair competition exists under California law when an appreciable number of reasonable buyers are likely to be confused by the similarity of the plaintiff's and defendant's marks." Mallard Creek Ind., Inc. v. Morgan, 56 Cal. App. 4th 426, 434 (1997) (citations omitted). Doucette Medical introduced no evidence of likelihood of confusion caused by any conduct on the part of Wu. It is not entitled to any recovery on this counterclaim.

**Third Counterclaim:  Intentional or Negligent Misrepresentation**

25. The tort of intentional misrepresentation requires proof of the following elements: "'(a) misrepresentation (false representation, concealment or nondisclosure); (b) knowledge of falsity (or scienter); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" Engalla v. Permanente Med. Grp., 15 Cal. 4th 951, 974 (1997) (citations omitted).  To prove negligent misrepresentation Doucette Medical was required to prove "(1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with the intent to induce another's reliance of the fact represented, (4) ignorance of the truth and justifiable reliance theron by the party to whom the misrepresentation was directed, and (5) damages." Fox v. Pollack, 181 Cal. App. 3d 954, 962 (1986).

26. Doucette Medical failed to meet its burden of proving either form of the tort. It failed to prove, <u>inter alia</u>, that Wu made any false representation to, or concealed any material facts from, Doucette Medical. It also failed to demonstrate that it suffered any damages caused by any such act on the part of Wu. (<u>See</u> Finding of Fact Nos. 41 through 48, above.)

**Fourth Counterclaim: Defamation**

27. To recover on its defamation claim, which is based on allegations of both slanderous and libelous statements, Doucette Medical must prove Wu uttered or wrote a false statement, which was published to another person. Cal. Civ. Code § 45a. Doucette Medical failed to adduce evidence of either a slander or libel published by Wu. Accordingly, she is not entitled to recover on this counterclaim.

**Fifth Counterclaim: Intentional Interference with Prospective Economic Advantage**

28. To recover for intentional interference with prospective economic advantage, Doucette Medical must prove the following elements: (1) Doucette Medical and a third party were in an economic relationship that probably would have resulted in an economic benefit to Doucette Medical; (2) Wu knew of the relationship; (3) Wu intended to disrupt the relationship; (4) Wu engaged in wrongful conduct, through misrepresentation or defamation; (5) the relationship was disrupted; (6) Doucette Medical was harmed; and (7) Wu's wrongful conduct was a substantial factor in causing Doucette's harm. <u>Youst v. Longo</u>, 43 Cal. 3d 64, 71 (1987) (citing <u>Buckaloo v. Johnson</u>, 14 Cal. 3d 815 (1975) (listing five elements) (overruled on other grounds)).

1    29.    Doucette Medical has failed to carry its burden of proving that Wu engaged in

2           wrongful conduct, the fourth element set forth above.  Accordingly, it cannot recover

3           on this counterclaim.

4

5    DATED:  April 8, 2010

6                                                   Virginia A. Phillips
                                                    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28